# Illinois and St. Louis Railroad and Coal Co.

## *v.*

## Francis H. Cobb.

1. Trespass quare clausum fregit—*prior possession not always evidence of prior right.* In an action of trespass *quare clausum fregit*, prior possession is not always proof of prior right; that depends upon the nature of the possession. Temporary occupancy without claim of right does not tend to show prior right.

2. Where, in an action of trespass *quare clausum fregit*, both parties claim prior possession, an instruction that a prior possession by the defendant will defeat a recovery by the plaintiff should not be given, unless the nature of the possession required in such case is stated.

3. Where a plaintiff has recovered in an action of trespass *quare clausum fregit*, such recovery is *res adjudicata*, as between the parties, that plaintiff's possession before the trespass in that suit complained of was peaceable, and prior to defendant's, and of such a character as to entitle the plaintiff to retake it, if it could be done peaceably.

4. Same—*second suit after ouster and re-entry.* Where a plaintiff recovered in an action of trespass *quare clausum fregit*, against a railroad company, for entering upon land in his possession, and building a track thereon, and the defendant paid the judgment, and the plaintiff afterwards peaceably retook possession of the same premises, and the defendant again entered upon it, and rebuilt its track, it was *held,* that the peaceable retaking possession by the plaintiff was lawful, and that he was entitled to recover in another action of trespass for the subsequent entry by the defendant.

5. SAME—*suit after re-entry and second ouster, and whilst wrongdoer is in possession.* In an action brought after ouster and before re-entry, the plaintiff can only recover for the ouster. Nor can he bring a second action for damages for the continuance of the wrongful possession by the wrong-doer, until he shall have made a re-entry; but, having re-entered, he has a right of action for the past intervening injury, which can not be taken away by a subsequent forcible ouster, and he may sue upon that right of action even after the second ouster, and when the wrongdoer is in possession.

APPEAL from the Circuit Court of St. Clair county; the Hon. HORATIO M. VANDEVEER, Judge, presiding.

Messrs. G. & G. A. KŒRNER, for the appellant.

Messrs. C. W. & E. L. THOMAS, for the appellee.

Mr. JUSTICE DICKEY delivered the opinion of the Court:

This was a judgment in the circuit court in trespass *quare clausum*, against appellant, brought here by appeal. The errors assigned were considered at a former term, and judgment in this court was rendered, reversing the judgment of the circuit court and remanding the cause for a new trial. At this term appellee brings the record before us on a petition for a rehearing.

The opinion of this court, heretofore filed, was pronounced, upon the supposition that the premises in question were shown, by the proofs in the record, to be within the boundaries of a certain lease, under which the appellant claimed right to possession. A careful inspection of the maps embodied in the record, in connection with the testimony, shows that the proof is otherwise. Hence, some things which were said in the former opinion are inapplicable to this case. The petition for rehearing must, however, be denied. The judgment was properly reversed upon other grounds which are not affected by the misapprehension on this point.

On the 6th day of March, 1872, Cobb, the appellee, brought an action of trespass *quare clausum fregit* against appellant, The Illinois and St. Louis Railroad and Coal Company, for entering appellee's close, laying down a railroad track thereon,

and removing soil and sand therefrom.   At the October term, 1872, this action was tried, and resulted in a verdict and judgment for the plaintiff for $600, which judgment appellant paid.

On the 6th day of March, 1873, (the high water of the Mississippi river having sometime previously covered the land in question and prevented the use of the railway track by appellant, appellee having re-entered the premises and repaired the fence which the company had originally broken down,) Cobb, on that day, brought another action of trespass against the company, to recover for all damages done by it since March 6, 1872—the time when the first action was brought.

On the same day, after this second action was begun, (March 6, 1873,) the company again broke down Cobb's fence, so repaired, at a point where it had been built across the railroad track, and as soon as the water had sufficiently subsided the company uncovered their railroad track, (which had, by means of the high water, been covered with sand,) and proceeded to use the same, and remove sand and soil from the premises in question.

During the summer of 1873 the water rose again, and submerged the premises, preventing the use of the railroad track, and the water, flowing into the sand pits made by the removal of sand by the company, washed away a large quantity of sand, and when the water had subsided, and at a time when the company was not making any use of the premises, and its servants were absent, the appellee again entered upon the premises, and repaired his fence sometime in August, 1873, and, claiming to be in possession, brought another action of trespass against the company for the damages since March 6, 1873—the time of the commencement of the second action.

These last two actions were, by agreement, consolidated, and tried together at the February term, 1875, and verdict and judgment was rendered for plaintiff for $5000 damages, from which judgment the company appealed to this court.

In addition to the above statement of the facts, as gathered from the record, there is evidence tending to prove that the premises in question is ground lying in front of a tract of land

known as Cahokia Commons. ˙ Cahokia Commons lie on the east bank of the Mississippi river. The line of this bank of the river, at this point, has undergone great changes, by reason of the action of the currents in the river. On the Map .C, in evidence, is shown the line of this bank as it was in 1814, and as it was in 1853, and as it was in 1870. The line of 1853 i's the most easterly of these lines, that of 1870 the farthest to the west, and that of 1814 is between these two lines, being farther west than the line of 1853 and not so far west as the line of 1870.

Between 1814 and 1853, the current of the river had worn away the east bank of the river, so that in 1853 the bank was far to the eastward of its line in 1814—perhaps the distance of half a mile. About 1853, the inhabitants, to whom Cahokia Commons belonged, under authority of an act of the legislature, laid out into lots a tract known as Survey 759 (constituting a part if not the whole of the Cahokia Commons), and leased many, if not all, these lots to different lessees, for a term of ninety-nine years, and among these leases was a lease of lot known as Lot 301, which leasehold estate in lot No. 301 appellant acquired and held before and during the transactions out of which this controversy has grown. Lot No. 301 lay, at the time of the lease, on the bank of the river, but the premises in question in this proceeding do not lie in front of lot 301, but in front of lots then lying on the bank of the river, and farther south than the most southerly point of lot 301.

It seems, from the proofs, that, by reason of artificial works constructed in the river at a point above these premises, a sand bar or little island began to form in the river some distance from the east bank, and in front of certain lots in survey 759, which lay farther south than lot 301. This sand bar or island seems, however, to have been east of the centre of the stream, and by the law, as ruled by this court, thereby became, in its several parts, a part of the lots, respectively, in front of which it was located. The island was an accretion to· the land in front of which it formed, inasmuch as each of the lots bounded by the stream extended, by law, to the thread of the

stream.  The evidence tends to show, that, in 1865 or 1866, Cobb took possession of the island, and not long after built a house upon it, in which he put a tenant, and claimed to be in possession as the owner of the whole island.  At this time this island was evidently small, and the waters of the river bounded the possession thereof as distinctly as a fence could have done.

The island grew, by accretion, in breadth and length, extending further both up and down the river, until the north end of it extended along in front of lot 301, but still some distance from the bank of the river.  The main bank of the river also extended westward by accretion, until the north end of the island, in about 1871, became connected to the main shore opposite it, on lot 301, and perhaps farther up the river.  The proofs tend to show that this connection between the island and the main east bank gradually extended farther south, until that part of the island formerly occupied by Cobb's tenant house was also connected with the shore, leaving what had been the south end of the island a peninsula.

The proofs also tend to show, that, about 1868 or 1869, appellant began to use the west bank of this island (at a point farther south than the line of Cobb's fence, hereafter mentioned,) for the purpose of landing barges and repairing the same, and continued to do so from time to time, and that, in the summer of 1871, Cobb built a fence across the island, from the river eastward to the meeting of the accretions of the east part of the island with the accretions of the main land, and thence south on the east side of the accretions of the island, and thence west to the river, thus inclosing that part of the land on three sides by fence, leaving the west bounded by the river.  Whether the company had any barges at this time on the west shore of what had been an island, at any point embraced in this inclosure, does not appear.  Cobb swears that he fenced this inclosure for pasture.  The proof tends to show that this inclosure of Cobb was undisturbed, and that Cobb had exclusive possession of the same until the 18th of January, 1872, and that, on that day, appellant, with a strong and violent hand, against the resistance of Cobb, forcibly broke down his fence and took

possession of the ground in controversy, and laid down a switch or railroad track across the then late line of Cobb's fence, extending into the inclosure, and began to remove sand and soil therefrom, and that on the 6th of March, 1872, Cobb brought the action of trespass first above mentioned, for damages for the ouster on January 18, 1872. and between that date and the time of that action, and in which, as above stated, Cobb recovered $600, which was paid.

At the trial of the last two actions, (in which the judgment now under consideration was rendered, and wherein Cobb recovered damages to the amount of $5000,) the plaintiff showed no paper title to the land in question, but merely evidence tending to show possession, with claim of ownership, from as early as 1867, and that he had never abandoned his claim.

The defendant (the *locus in quo* not being part of the lot 301, mentioned in the lease,) showed no paper title to the premises in question.

Neither party showing a paper title, the whole case must turn upon the question of the date and nature of the several possessions set up, by the parties, respectively.

It is claimed by appellant, that certain instructions refused should have been given. On examination they seem to have been faulty to such a degree, that the circuit court properly refused them. In one it is said: "If the possession of defendant was prior to the said plaintiff putting up his fence, and plaintiff does not show any better or paramount title to the premises in question, he can not recover, and the jury must find for the defendant."

Had the legal proposition in the body of the instruction been right, the last member of the same is faulty in not qualifying the statement, "and the jury *must* find for the defendant," with the words "in such case," or some equivalent words. This, alone, is a justification of the refusal of the instruction.

But the body of the instruction ought not to have been given. It ignores entirely the evidence tending to show Cobb's possession and claim of right long prior to the building of the

---

fence. The court ruled right in refusing to take that question from the jury. It is faulty in not stating the nature of the prior possession which should have such potent effect. Mere prior possession is not always proof of prior right; that depends upon the nature of the possession. The temporary occupancy of ground, without claim of right, does not tend to show prior right.

Again, it had been *adjudicated*, as between these parties, in the first action, (in which Cobb recovered $600,) that Cobb's possession, which he held on January 18, 1872, and which was violated by the company, was a peaceable possession of the premises in question. If that possession was, on that day, good enough to maintain the first action, it was good enough to enable plaintiff to lawfully retake it, if it could be done peacefully.

In another of the instructions, for the refusal of which appellant complains, it was said: "The law is, that, if plaintiff was in possession when he brought his first action,    *    *    *    *    and was wrongfully ousted by defendant, yet he must be in actual possession before he can bring another suit, and if he was not in actual possession at the time the suits in this case were brought, the jury must find for the defendant," etc. This is not the law. It is true, in an action brought after ouster and before re-entry, plaintiff can only recover for the ouster. Nor can he bring a second action for damages for the continuance of the wrongful possession of the wrong-doer until he shall have made a re-entry; but having re-entered, he has a right of action for the past intervening injury, which can not be taken away from him by a subsequent forcible ouster, and he may sue upon that right of action even after the second ouster, and when the wrong-doer is in possession.

It is insisted that plaintiff's re-entries were against the known will of the occupant, and one of them by trickery, and that the circuit court should have treated such re-entries by plaintiff as forcible and illegal, and therefore equivalent to no entries, and we are referred to the cases of *Reeder* v. *Purdy*,

41 Ill. 279, and *Comstock* v. *Henneberry*, 66 Ill. 212, as supporting this position.

In each of those cases the possession entered upon was a peaceable and lawful possession, not acquired by force.

In the case of *Reeder* v. *Purdy*, the possession violated was that of a tenant, peaceable and lawful.

In the case of *Comstock* v. *Henneberry*, the possession of Comstock, which was violated, was a possession which had been adjudged to him in a litigation to which Henneberry was a party in interest, and which had been given to Comstock by an officer of the law, under the judgment.

The general words used in the opinion in the *Purdy case* are qualified by the court in the latter part of the opinion, where examples are given, in which the court hold the rule would not apply.

The fair inference from both of these cases is, that the rules laid down there are not to apply to a peaceable re-entry by a party who has been put out by lawless force. To hold that a party who has, by lawless force, driven a weaker party from a peaceable possession, has thereby acquired a possession so sacred that the expelled party may not, if he can do so without a breach of the peace, re-enter, for the mere purpose of complying with a technical rule of law which prevents him from bringing an action of trespass until he has re-entered, would be carrying the rule to a length never contemplated and wholly unwarranted by any provision of law, whether statutory or common law.

These instructions were properly refused.

The damages are complained of as excessive. This position of appellant, we think, is well taken. We find no warrant in the evidence, as presented in this record, for the amount of damages allowed.

As this case must go before another jury, to be tried again, and perhaps upon other evidence, we forbear a discussion of the evidence in this record. Let it suffice that, in the judgment of this court, the evidence in this record did not warrant the jury in so great an estimate of the damages.

It was made a question here as to the competency of proof tending to show filling up, by the action of the waters of the river, of the cavities from which sand and soil had been taken or washed. This, we think, was proper, as showing that the effect was less injurious than it otherwise would have been. All facts bearing upon that question should go to the jury.

The rehearing is denied.

*Rehearing denied.*